UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

| | |
|---|---|
| BRIAN LEE SLADE, ) | |
| ) | |
| Petitioner, ) | Case No. 1:03-cv-898 |
| ) | |
| v. ) | Honorable Richard Alan Enslen |
| ) | |
| KENNETH McKEE, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Respondent. ) | |
| ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of life imprisonment imposed by the Benzie County Circuit Court on November 20, 2001, after a jury convicted Petitioner of second-degree murder, MICH. COMP. LAWS § 750.317. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

I. The Petitioner's Fifth and Fourteenth Amendment rights were violated by the prosecution's eliciting of testimony wrongly implying the Petitioner had refused to take a polygraph examination before the jury, and eliciting of testimony improperly designed to magnify sympathy, by stating the decedent had died a horrific and painful death.

II. The failure of the trial court to give the Petitioner's requested Jury Instructions on self-defense and the past violent conduct of the deceased denied the Petitioner Due Process of Law, and violated the Fifth, Sixth, and Fourteenth Amendment to the United States Constitution.

Respondent filed an answer to the petition (docket #26) stating that Petitioner's claims are unexhausted because they were not fairly presented as federal claims in the state courts. Alternatively, Respondent maintains that Petitioner's grounds are without merit. Upon review and

applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.[1]

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from the death of Debra Barth, Petitioner's girlfriend, on or about September 14, 2000. Barth's body was discovered in the basement of the house she shared with Petitioner on M-115 just outside of Frankfort. Petitioner was tried before a jury beginning on September 12, 2001, and concluding on September 21, 2001.

Michael Salagovich testified that he had known both Petitioner and Barth for more than twenty years. (Tr III, 430.) Salagovich last saw Petitioner and Barth at his home on the evening of September 14, 2000. (Tr III, 433.) They both seemed drunk and Petitioner was being "kind of physical" with Barth by poking her in the head. (Tr III, 433.) When Salagovich went to the bathroom, he heard Barth tell Petitioner to take his hands off her neck and to leave her alone. (Tr III, 433.) Barth had told Salagovich earlier that day that she had packed her stuff and was going to leave Petitioner. (Tr III, 434.) At the time of trial, Salagovich was incarcerated in the Benzie County Jail on probation violation charges. (Tr III, 429.)

Amy Griffin testified that she had two children with Petitioner. (Tr III, 443.) Their relationship had ended about five years earlier. (Tr III, 443-47.) Petitioner came to Griffin's home to visit the children at about 9:30 a.m. on the morning of Friday, September 15. (Tr III, 445-46.) He was driving Barth's car, a red Baretta. (Tr III, 452, 458.) He looked shaken and as if he had been

---

[1] An application for a writ of habeas corpus may be denied on the merits, notwithstanding the Petitioner's failure to exhaust state-court remedies. 28 U.S.C. § 2254(b)(2). Because Petitioner's claims fail on their merits, the Court need not address whether Petitioner properly exhausted his federal claims in the state courts.

- 2 -

crying. (Tr III, 448.) While Petitioner was playing with their daughter, Griffin noticed that he had some bruises on his upper arms. (Tr III, 453-55.) Petitioner took the children for the weekend and returned them on Sunday evening. (Tr III, 457.) When Griffin mentioned Barth, Petitioner said that she was in the Upper Peninsula at a pow wow. (Tr III, 460.)

Brant Slade, Petitioner's half brother, testified that Petitioner came to his house at about 9:30 p.m. on the evening of Sunday, September 17. (Tr III, 486.) He was driving Barth's car and appeared intoxicated. (Tr III, 486.) Brant was concerned because Petitioner, who did not have a driver's license, appeared to be drinking and driving. (Tr III, 488-89.) He also was concerned because he had never seen Petitioner driving Barth's car. (Tr III, 487.) Brant arranged a family intervention at Lower Herring Lake for later that evening. (Tr III, 489.) He hoped to get Petitioner into alcohol rehabilitation the next day. (Tr III, 489, 526.) Brant drove Petitioner to meet with other family members, including Petitioner's twin brother, Billy Slade. Billy and Petitioner got into a physical altercation because Billy was angry about Petitioner's drinking. (Tr III, 524-25.) During the altercation, Brant called 911 because he wanted to get Petitioner some help. (Tr III, 493.) By the time the police arrived, the altercation had ended. (Tr III, 527.) Brant and Billy hoped that Petitioner would be arrested for violating his probation by drinking, but the officers would not arrest him. (Tr III, 496, 525.) Family members also expressed concern to police about Barth because no one had heard from her and Petitioner was driving her car. (Tr III, 495.)

Brant Slade further testified that Barth was drunk every time he visited the home she shared with Petitioner, even when he visited early in the morning. (Tr III, 504-505.) Brant described several incidents of violence committed by Barth against Petitioner when they both were intoxicated. On one occasion, he saw Barth grab Petitioner by the throat for no reason. (Tr III, 505-507.)

Another time, Brant witnessed Barth backhand Petitioner in the nose without provocation. (Tr III, 508.) Brant also had seen unusual marks on Petitioner's body, including deep scratches. (Tr III, 509-510.) One time when Brant went to Petitioner and Barth's house, Barth's daughter, Kristy, came out of the house holding her head and crying. She said that her mother had just hit her with a beer bottle. (Tr III, 510.)

Deputy Mark Ketz and Sergeant John Brazaski of the Benzie County Sheriff's Department responded to the 911 call Brant made from Lower Herring Lake. (Tr III, 539.) Ketz testified that Petitioner was highly intoxicated. (Tr III, 541.) Ketz testified that they had no legal ground to arrest Petitioner. (Tr III, 543.) In the case of a suspected probation violation, the officers are required to submit an incident report to the prosecutor's office, who would then decide whether to pursue an arrest warrant. (Tr III, 543.)

On September 19, 2000, Barth's daughter and Michael Salagovich both filed missing persons reports concerning Barth. (Tr III, 556-58, 583-85.) After conducting a brief investigation, police sought a search warrant for Barth's residence. (Tr III, 517-18, 556-62, 583-84, 606-611.) They obtained the search warrant at about 11:30 p.m. on September 19. (Tr III, 611.) The officers found the interior of the house to be completely cluttered with garbage and debris. (Tr III, 615; Tr IV, 635.) During an initial search of the residence, officers observed what appeared to be clumps of hair and blood in the master bedroom. (Tr III, 613-15; Tr IV, 639.) There was a large blood stain on the mattress, that was partially concealed by a large cushion. (Tr IV, 639; 715.) In the basement, household debris was piled several feet high in some areas. (Tr III, 591-92.) Only a small pathway provided access from the stairway across to the other end of the basement. (Tr III, 615; Tr IV, 650.) Officers also located a bundle of sheets and blankets at the base of a large tree in the yard. (Tr III,

549, 620-25.) A more thorough search was conducted when the evidence technicians arrived at the house on the morning of September 20. (Tr IV, 641.) While taking pictures in the basement, a technician found Barth's body under a pile of debris. (Tr IV, 694-95, 702-703.)

The pathologist testified that he could not determine exactly when Barth died, but that her body showed signs of "marked decomposition," as if she had been dead for several days, perhaps a week. (Tr IV, 748-49.) She had numerous scrapes and abrasions on her legs, arms and shoulders. (Tr, IV, 747, 796.) The victim also had bruises on her left arm and hip. (Tr IV, 747-48.) Almost all of her ribs were broken, both front and back. The pathologist indicated that the cause of death was multiple rib fractures, which rendered her unable to breath. (Tr IV, 756-57.) He opined that the broken ribs resulted from blunt-force trauma, such as kicking or stomping. (Tr IV, 769-70.) He did not believe that an average person could punch hard enough to cause such injuries to the victim's ribs. (Tr IV, 770.) Barth had a blood alcohol level of .18 percent at the time of her death. (Tr IV, 780.) She weighed 164-170 pounds and was 5' 6" tall. (Tr IV, 786-87.)

On September 21, 2000, state police arrested Petitioner at a convenience store and gas station in Kingsley. (Tr III, 474.) Petitioner was driving Barth's car. When the police came into the store to make the arrest, Petitioner was holding a check in the amount of $35.00 drawn on the account of Debra Barth from State Savings Bank. (Tr III, 475.) The check bore the alleged signature of Debra Barth. (Tr III, 475.)

Police officers questioned Petitioner on the evening of September 21 and the morning of September 22. Two days later, after his arraignment, Petitioner sent a note from the jail asking to talk to Detective Troy Lamerson, which resulted in another interview. Recordings of the three interrogations were played for the jury. In his first statement on the evening of September 21,

Petitioner told police that he dropped off Barth in Traverse City and she went from there to a pow wow in the Upper Peninsula. (Tr IV, 662.) When the officers told Petitioner that Barth was dead, he started crying, but said that he did not know what happened to her. (Tr IV, 662.) However, during subsequent interview, Petitioner told police that he and Barth went to Mike Salagovich's house on the night of September 14, because Barth wanted to trade him marijuana for Stadol. (Tr IV, 674, 678, 809.) He stated that he and Barth got into an argument after they got home, but there was no physical altercation. (Tr IV, 678, 813.) Petitioner claimed that he had a beer and they went to bed around 11:00 p.m. or midnight. (Tr IV, 678.) Petitioner told police that he did not recall what happened from the time he went to bed until he woke up around 4:30 a.m. and found Barth dead. (Tr IV, 677, 814.) Petitioner knew she was dead because she was cold and not breathing. (Tr IV, 814) He claimed that he "freaked out" and attempted to revive her by blowing air into her mouth. (Tr IV, 675-77, 811, 818.) Petitioner was afraid of being blamed for her death, so he took her body to the basement and covered her with insulation and other debris. (Tr IV, 677, 814.) Petitioner also admitted that he removed the bloody bedding and tried to hide it outside. (Tr IV, 813.)

Detective Troy Lamerson testified that he taped his September 24 interview with Petitioner. (Tr V, 865.) Lamerson had listened to the tape, but not in several months. (Tr V, 865.) The audio tape (Exhibit 36) was played for the jury, but was stopped after Lamerson said, "The one option we have is a polygraph examination." (Tr V, 867.) Defense counsel immediately objected and asked for a cautionary instruction. (Tr V, 868.) After the jury was removed from the courtroom, defense counsel moved for a mistrial both for the polygraph reference and Lamerson's earlier comment that the pathologist told him that Barth "died a horrific, painful death." (Tr V, 868, 877-79.) The Court denied the motion for a mistrial and gave the jury a cautionary instruction. (Tr I,

882.) The remainder of the tape, which contained no further references to a polygraph examination, was played for the jury. (Tr V, 882.)

The defense called numerous witnesses who testified regarding Barth's alcoholism and violent behavior toward Petitioner and others. William and Krista Slade, Petitioner's twin brother and sister-in-law, testified that Petitioner and Barth drank heavily and had frequent fights. (Tr V, 885-86.) A month or two before Barth's death, Petitioner had two black eyes and scratches on his face arms and shoulders. (Tr V, 887, 893.) On another occasion, Petitioner had bite marks all over his body. (Tr V, 887, 894.) Tawny Slade, Petitioner's sister, testified that Petitioner was an alcoholic and experienced black outs. (Tr VI, 917.) She further testified that Barth drank constantly and had a reputation for being violent. (Tr VI, 920.) Tawny saw Barth hit Petitioner. (Tr VI, 921.)

Kenneth Shaver testified that when he dated Barth about eight years earlier, she could be violent when she drank. (Tr VI, 933-34.) On one occasion when he and Barth got into an argument in the kitchen, and she hit him in the head with a small cast iron frying pan. (Tr VI, 935.)

Deputy Matt Maratea testified that he was dispatched to Petitioner and Barth's residence on June 3, 2000, for a domestic assault in progress. (Tr VI, 938.) Barth and her daughter, Kristy McCrary, answered the door. Petitioner was in the bedroom sitting on the bed. (Tr VI, 939.) Maratea observed dry blood under Petitioner's nose and several fresh bite marks on his left arm, neck and face. (Tr VI, 940.) Petitioner told him that an argument turned violent and Barth and McCrary bit him. (Tr VI, 941.) According to Maratea, Petitioner took the worst beating. (Tr VI, 947.) All three of them were arrested and taken to the county jail. Detective Troy Lamerson testified during the prosecution's case-in-chief that he had seen Petitioner at the county jail following his arrest on

June 3, 2000. (Tr V, 851-58.) Lamerson observed bite marks, scratches and bruises on Petitioner's face, arms and torso. (Tr V, 855-56.)

Mark McConnell testified that he was married to Barth from 1991 to 1998. (Tr VI, 949.) McConnell stated that Barth sometimes became violent when she drank. (Tr VI, 951.) During one argument, Barth grabbed a knife and cut him in the back as he was walking away from her. (Tr VI, 951.) Barth took him to the hospital and they made up a story that he fell from a ladder and cut his back on a nail. (Tr VI, 951).

Frances Amond, Petitioner and Barth's neighbor, testified that Barth was always drinking and hit Petitioner for no reason when she was drunk. (Tr VI, 955.) On one occasion, Amond saw Barth and her daughter get Petitioner down on the floor and kick, punch and bite him. (Tr VI, 957.) Amond saw Petitioner several times when he had black eyes and was bruised and scratched all over his body. (Tr VI, 957.) Once when Slade punched her back in self-defense and split her lip, she grabbed a butcher knife and went towards him. (Tr VI, 956-57.) Amond intervened and convinced Barth to drop the knife. (Tr VI, 956.)

The trial court instructed the jury on the charged offense of second-degree murder and the lesser offense of voluntary manslaughter. The Court refused Petitioner's request to instruct on self-defense. At the conclusion of trial, on September 21, 2001, the jury found Petitioner guilty of second-degree murder. (Tr. VII, 1045.)

**B. Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 13, 2002, raised the following two claims of error:

> I.    Was Defendant Brian Slade denied a fair trial because the jury heard the investigating detective testify that the deceased died a horrific death and heard the interrogation tape that the detective said that Slade could take a polygraph examination concerning his story, and did the trial judge commit reversible error in denying defense counsel's motion for a mistrial.
>
> II.   Where the evidence showed that the deceased was a violent alcoholic and had in the past beaten Brian Slade and attacked him with a butcher knife and where the defense was that Slade was defending himself from her aggression when he killed her, did the circuit judge commit reversible error in refusing to give the jury the standard instructions of self-defense and that for second-degree murder there must be no justification or excuse lowering the offense.

(*See* Def.-Appellant's Br. on Appeal, docket #22.) By unpublished opinion issued on March 11, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 3/11/03 Mich. Ct. App. Opinion ("MCOA Op."), docket #22.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals. By order entered July 28, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #23.)

**Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429

(6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I. Evidentiary Errors

Petitioner contends that his due process rights were violated when the prosecutor introduced a taped interrogation that included discussion of Petitioner taking a polygraph examination. Petitioner further claims that the prosecutor engaged in misconduct when he elicited testimony from Detective Lamerson that the victim "had died a horrific and painful death."

During his direct examination of Detective Lamerson, the prosecutor questioned Lamerson regarding the victim's cause of death. The following exchange occurred:

Q: Okay. And you had just attended the autopsy?

> A: Right. The previous day I had been down to Dr. Cohle's. I had known and he had shown me and I had witnessed for myself all the ribs had been broken, both inside and the front and back, so I knew that it was a severe something that happened that caused her death.
>
> Q: Okay. And is that what you were inquiring into when you were talking to the defendant towards the end of tape the [sic] there?
>
> A: Right. As I explained it, the doctor told me she had died a horrific, painful death, and it wasn't something that was a single –
>
> Defense Counsel: I'm going to object, Your Honor, that's hearsay, and request that it be stricken.
>
> The Court: Sustained.

(Tr V, 849.) Later in Lamerson's testimony, the prosecutor introduced an audio tape of Lamerson's September 24, 2000 interview with Petitioner. The tape contained the following exchange between Lamerson and Petitioner:

> Petitioner: I ended up passing out. I had to –
> Lamerson: Why is that?
>
> Petitioner: Because I don't recall. I do not recall. Last thing I remember is Savalgovich's and, uh, I have been telling the truth, Troy.
>
> Lamerson: Okay. Well, one option we have is a polygraph examination. [**Tape stopped at trial.**] The lie-detector can - - it only registers, to the best of my understanding, only what you do remember, so if you don't remember anything, it can't register. It can only remember what you - - you can consciously remember happened. So maybe we can do that to see if you actually do recall what took place. Is that something you might want to do?
>
> Petitioner: Yes, as soon as I speak with my lawyer.
>
> Lamerson: Okay.

(Tr V, 875-76.) There was no further discussion of a polygraph examination during the interview. The tape was played for the jury, but stopped after Lamerson said, "one option we have is a

- 12 -

polygraph examination." (Tr V, 867.) Defense counsel immediately objected and asked for a cautionary instruction. (Tr V, 868.) After the jury was removed from the courtroom, defense counsel moved for a mistrial both for the polygraph reference and Lamerson's earlier comment that the pathologist told him that Barth "died a horrific, painful death." (Tr V, 868, 877-79.) The Court denied the motion for a mistrial and gave the jury the following cautionary instruction:

> Members of the jury, you have heard reference to a possible polygraph examination, a so-called lie-detector. Polygraph examination results are not admissible evidence because it has not been scientifically established that they are reliable enough to be admitted into evidence in our courts. In this case, there are no polygraph results period, either admissible or inadmissible. You should not speculate at all as to polygraphs. They simply are not a part of this trial and I am striking from the record all reference that was on the tape.

(Tr I, 882.) After the court's instruction, the tape was forwarded past the remaining discussion about the polygraph and played for the jury without incident. (Tr V, 882.)

On appeal, Petitioner claimed that the trial court committed error by denying his motion for a mistrial based upon Lamerson's statement regarding the victim's death and the reference to the polygraph examination. In rejecting Petitioner's claim, the Michigan Court of Appeals stated:

> In this case, a police officer's testimony included a hearsay statement. An unresponsive, volunteered answer to a proper question is not cause for granting a mistrial. In *Lumsden*[2], this Court determined a mistrial was not warranted when a witness inadvertently referred to other homicides allegedly committed by the defendant. This Court stated the reference was fleeting and not emphasized to the jury. Similarly, here, the officer's comment about Barth's death was brief and inadvertent. Importantly, the officer's comment was merely a summary of other testimony. The forensic pathologist testified Barth suffered multiple rib fractures that caused her to be unable to breathe and that she was alive when she received the fractures. The testimony indicated Barth died a painful and horrific death, and the jury was not improperly influenced by the police officer's hearsay statement of the obvious.

---

[2] *People v. Lumsden*, 423 N.W.2d 645 (1988).

- 13 -

\*\*\*

> While listening to an audiotaped police interview with Slade, the jury also heard reference to the possibility that he could take a polygraph examination. Normally, reference to a polygraph examination is not admissible before a jury. It is a bright-line rule that reference to taking or passing a polygraph examination is error. However, merely referring to a polygraph examination does not always constitute error requiring reversal. For example, when the mention of a polygraph examination was brief, inadvertent, and isolated, it may not require reversal. To determine if reversal is required, the following factors may be considered: (1) whether the defendant objected or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness' credibility; and (5) whether the results of the examination were admitted rather than merely the fact that an examination had been conducted.
>
> Here, we conclude the reference to the polygraph examination was inadvertent. While the reference was due to a prosecutor error, defense counsel had been given a transcript of the interview and could have prevented the jury from hearing the reference. Importantly, there was no mention of the results of a polygraph examination or even if a polygraph examination had been taken. Additionally, the trial court's instructions to the jury regarding the mention of the polygraph examination were thorough and explained that any reference must not be considered admissible evidence. We conclude that the trial court properly denied Slade's request for a mistrial because the reference to a polygraph examination was brief and inadvertent and the hearsay statement was harmless because the facts were shown by other testimony.

(MCOA Op. at 1-2, footnotes omitted.)

While Petitioner now asserts a violation of his federal due process rights, his federal claim must fail for the same reasons cited by the court of appeals. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review,

a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

As noted by the Michigan Court of Appeals, the Detective Lamerson's statement that "the victim died a horrific, painful death" was brief and consistent with the evidence given by the pathologist concerning Barth's cause of death. Moreover, it is clear from the trial record that Detective Lamerson's statement regarding the victim's death was non-responsive to the prosecutor's question. The prosecutor cannot be found guilty of misconduct when he unexpectedly received a non-responsive answer to an innocent question. *See United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). Accordingly, I cannot find that Petitioner was denied a fair trial as a result of Lamerson's statement.

Likewise, the reference to a polygraph examination on the audiotape did not result in the denial of a fundamentally fair trial. Under Michigan law, "[n]ormally reference to a polygraph is not admissible before a jury. Indeed it is a bright line rule that reference to taking or passing a polygraph test is error." *See People v. Nash*, 625 N.W.2d 87, 91 (Mich. Ct. App. 2000). It does not follow that allowing such evidence to be admitted in a criminal trial would violate the Constitution. As discussed above, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." *See Estelle*, 502 U.S. at 67-68. The Due Process Clause

provides a remedy only when the admission of unduly prejudicial evidence renders a trial fundamentally unfair. *See Payne v. Penn.*, 501 U.S. 808, 825 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179-183 (1986)); *Seymour*, 224 F.3d at 552.

The Supreme Court has never held that statements implying the results of a polygraph test result in the denial of fundamental fairness, in violation of the due process clause. *See Maldonado v. Wilson*, __ F.3d __, 2005 WL 1654766, at *6 (6th Cir. July 15, 2005). Furthermore, despite "generally disfavor[ing] admitting the results of polygraph examinations," *United States v. Thomas*, 167 F.3d 299, 308 (6th Cir. 1999), the Sixth Circuit has, "refused to impose a per se prohibition against polygraph evidence, and the mere mention of the words 'polygraph examination' does not entitle a defendant to a new trial." *United States v. Odom*, 13 F.3d 949, 957 (6th Cir. 1994); *see also Passino v. Tessmer*, No. No. 01-1316, 2003 WL 678969, at *3 (6th Cir. Feb. 25, 2003). In this case, the only reference to a polygraph examination heard by the jury was Lamerson's statement to Petitioner during a taped interrogation, "Well, one option we have is a polygraph examination." The reference to such a test was confined to that single instance and did not reveal whether Petitioner took a polygraph examination or the results of any polygraph examination. Moreover, the trial court gave the jury a curative instruction. Petitioner, therefore, is not entitled to habeas corpus relief.

## II. **Failure to Instruct on Self-Defense**

Petitioner further claims that the trial court violated his Fifth, Sixth and Fourteenth Amendment rights by refusing to give the jury two instructions concerning self-defense. Petitioner requested CJI2d 7.15 "Use of Deadly Force in Self-Defense" and CJI2d 7.23 "Past Violence by Complainant of Decedent." The trial court concluded that there was not sufficient evidence presented at trial to support the self-defense instructions. Specifically, the trial court found no

evidence that "the deceased was the aggressor in this particular instance." (Tr VI, 963-971.) On appeal, Petitioner claimed that the trial court committed reversible error by refusing to instruct on self-defense. The Michigan Court of Appeals upheld the trial court's decision, stating:

> [T]he killing of another person in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." While a defendant may use circumstantial evidence to show he acted in self-defense, here, Slade presented no evidence about what happened at the time Barth was murdered. The jury instructions related to self-defense and past violent conduct were not supported by evidence presented at trial. While there was testimony about Barth's past violent conduct, there was no evidence presented to support an instruction that Slade honestly and reasonably believed his life was in imminent danger or he feared serious bodily harm on the night of the murder.
>
> Additionally, although the trial court read the second-degree murder instruction in its entirety; it slightly altered paragraph four. Jury instructions are viewed in their entirety. Even if somewhat imperfect, instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights. Here, the trial court's omission of the words "justified" and "excused" did not create error because the instructions in their entirety fairly presented the issues. Slade presented no evidence that he acted in self-defense on the night of the murder; therefore, he presented no evidence that the murder was justified or could be excused. While Slade did present evidence of Barth's past conduct, none of it related to the night of the murder. Therefore, we conclude that the trial court's instructions to the jury were proper based on the evidence presented.

(MCOA Op. at 4) (footnotes omitted).

As set forth above, federal habeas corpus review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle*, 502 U.S. at 68. Typically, a claim that a trial court failed to give a self-defense instruction is not cognizable on habeas review because it presents only a question of state law. *See Phillips v. Million*, 374 F.3d 395, 397-98 (6th Cir. 2004) (finding no controlling Supreme Court authority concerning the denial of a self-defense instruction and the right to due process). Errors of state law will not warrant habeas relief unless the error rises to the level of depriving the defendant of fundamental fairness in the trial

process. *Id.* (citing *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002)). Moreover, to demonstrate entitlement to relief under the Sixth Amendment, Petitioner must show that he was denied an instruction on a defense for which he presented evidence. *Mathews v. United States*, 485 U.S. 58 (1988).

For his defense, Petitioner presented extensive testimony concerning Barth's alcoholism and her history of physical violence towards Petitioner and others. However, as discussed by the state courts, none of that evidence pertained directly to the night of Barth's murder. Because Petitioner did not testify at trial, he was unable to present testimony regarding the events immediately preceding Barth's death. The only evidence cited by Petitioner concerning the night of Barth's death are his statements to Detective Lamerson, which were played for the jury at trial. Petitioner characterizes his statement as follows: (1) "that the decedent was drunk and obnoxious on the night she died"; (2) "[the decedent] was picking fights with the Petitioner over his job and sex; and (3) "that they then got into a fight at home on the night of her death." (Petitioner's Brief in Support, 30, docket #2.) These statements do not indicate that Barth physically attacked Petitioner or did anything else to place him in fear of serious bodily injury. Furthermore, the evidence presented at trial concerning the extent of Barth's injuries was inconsistent with Petitioner's theory of self-defense. Almost all of her ribs were broken, both front and back. The pathologist testified that Barth died as the result of multiple rib fractures, which rendered her unable to breath. (Tr IV, 756-57.) Moreover, the jury found Petitioner guilty of second-degree murder, rather than the lesser offense of involuntary manslaughter. In light of the evidence presented at trial and the jury's verdict, I cannot find that the trial court's refusal to instruct on self-defense resulted in the denial of fundamental fairness. Petitioner, therefore, is not entitled to habeas corpus relief.

**Recommended Disposition**

    For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  August 9, 2005           /s/ Ellen S. Carmody
                 ELLEN S. CARMODY
                 United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).